UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RONALD I. CHORCHES, TRUSTEE,

*Plaintiff*,

v.

THE CATHOLIC UNIVERSITY OF AMERICA

*Defendant*.

No. 3:16-cv-1964 (MPS)

**RULING ON MOTION TO DISMISS**

Catholic University ("Catholic") moves to dismiss claims by a Chapter 7 bankruptcy trustee seeking to avoid transfers made by the debtors for their adult daughter's college tuition. The trustee, Ronald I. Chorches, alleges that the transfers violated both 11 U.S.C. § 548(a)(1)(B) (Count One of the Amended Complaint) and Conn. Gen. Stat. §§ 52-552e(a)(2) and 52-552f(a) (Count Two of the Amended Complaint), both of which allow creditors to recover property that an insolvent debtor transfers without receiving "reasonably equivalent value" in return. Catholic argues among other things that the funds the debtors paid for their adult daughter's college tuition should be considered expenses of the family as a single economic unit and were, therefore, exchanged for reasonably equivalent value within the meaning of these statutes. For the reasons below, I DENY the motion to dismiss.

**I.    Factual Allegations**

At all relevant times, Julia Franzese, James and Kristin Franzese's daughter, was more than 18 years old. (ECF No. 24 at ¶ 5.) She was a student at Catholic University from August 2011 to August 2014. (*Id.* at ¶ 6.) Chorches, the trustee for the Franzeses' bankruptcy estate, alleges that, for this entire period, James and Kristin were insolvent (*Id.* at ¶ 7.) He includes specific information

1

regarding the Franzeses' debts, as detailed in their bankruptcy petition. (*Id.* at ¶ 8.) He alleges that the Franzeses were "unable to pay their debts as they became due, as evidenced by their large tax debt and the foreclosure on their home in 2011." (*Id.* at ¶ 12.)

The Franzeses paid Catholic University $64,845.50 for Julia's tuition between September 2011 and June 2014. (*Id.* at 7, ¶ 19.) They paid $30,659.50 of this amount between September 2013 and June 2014. (*Id.* at 5, ¶ 19.) Chorches alleges that, at the time of these payments, the debtors "were engaged in a business or transaction, or were about to engage in a business or transaction, for which any property remaining with [them would have been] an unreasonably small amount of capital" and that they "intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured." (*Id.* at 6, ¶ 23, 9, ¶ 22.)

On August 24, 2015, James and Kristin Franzese filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. (*Id.* at ¶ 3.) Chorches brought this lawsuit against Catholic University for the amount the debtors paid in tuition during the two years before filing for bankruptcy under 11 U.S.C. § 548(a)(1)(B), which creates a two-year look-back period for fraudulent transfers, and during the four years before filing for bankruptcy under Conn. Gen. Stat. §§ 52-552e(a)(2) and 52-552f(a), which, together with § 52-552j, creates a four-year look-back period for such transfers. (ECF No. 24 at 10); 11 U.S.C. § 548(a)(1)(B); Conn. Gen. Stat. §§ 52-552e(a)(2), 52-552f(a), 52-552j.[1] He alleged that these tuition payments were constructively fraudulent transfers and that the Franzeses' estate can avoid them. (ECF No. 24 at 10.) Catholic moved to dismiss. (ECF No. 7.) I granted that motion to dismiss, with leave to replead, finding

---

[1] The two years in the bankruptcy code provision are measured from the time of the filing of the petition; but the four years in the Connecticut statute are in most circumstances measured from the time of the transfer. *Compare* 11 U.S.C. § 548(a)(1)(B) *with* Conn. Gen. Stat. § 52-552j. Chorches nonetheless seeks in Count Two to recover transfers occurring during the four years before the *bankruptcy filing*. (ECF No. 24 at 7–8.)

2

that Chorches had failed to allege specific facts supporting the allegation that the Franzeses were insolvent at the time they made the transfers to Catholic. (ECF No. 23.) Chorches then filed an amended complaint, correcting that deficiency. (ECF No. 24.) Catholic has now moved to dismiss the amended complaint. (ECF No. 25.)

## II. Rule 12(b)(6) Standard

Under Fed. R. Civ. P. 12(b)(6), I must determine whether Chorches has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under *Twombly*, the Court accepts as true all of the complaint's factual allegations when evaluating a motion to dismiss. *Twombly*, 550 U.S. at 572. The Court must "draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008) (internal quotations and citations omitted). For a complaint to survive a motion to dismiss, "[a]fter the court strips away conclusory allegations, there must remain sufficient well-pleaded factual allegations to nudge plaintiff's claims across the line from conceivable to plausible." *In re Fosamax Products Liab. Litig.*, No. 09-cv-1412 (JFK), 2010 WL 1654156, at *1 (S.D.N.Y. Apr. 9, 2010) (internal quotations and citations omitted).

A claim of constructive fraudulent transfer (*i.e.*, one not relying on fraudulent intent) must be pled in accordance with Rule 8(a), rather than the heightened Rule 9(b) standard for fraud claims. *In re Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 317, 332 (Bankr. S.D.N.Y. 2011).

## III. Analysis

In Count One of the Amended Complaint, Chorches seeks to avoid the $30,659.50 of payments made to Catholic University within two years of the debtors' petition under 11 U.S.C. § 548(a)(1)(B). To allege adequately his claim of constructive fraudulent transfer under 11 U.S.C. § 548(a)(1)(B), Chorches must plead facts showing that: (1) the debtors had an interest in the property; (2) a transfer of that interest occurred within two years of the filing of the bankruptcy petition; (3) the debtors received less than *reasonably equivalent value* in exchange for the transfer; and (4) the debtors either were insolvent at the time of the transfer or became insolvent as a result of the transfer, were engaged in a business or transaction or were about to engage in a business or transaction for which any property remaining with them represented unreasonably small capital, or intended to incur, or believed they would incur, debts beyond their ability to pay.

In Count Two of the Amended Complaint, Chorches seeks to avoid the $64,845.50 of payments made to Catholic University within four years of the debtors' petition under Conn. Gen. Stat. §§ 52-552e and 52-552f(a). § 52-552e(a)(2) states:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation . . . without receiving a *reasonably equivalent value* in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assess of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Conn. Gen. Stat. § 52-552e(a)(2) (emphasis added). § 52-552f(a) states:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a *reasonably equivalent value* in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

4

Conn. Gen. Stat. § 52-552f(a) (emphasis added). Connecticut courts analyze these two provisions together, as a single claim. *Gen. Landscaping, LLC v. JPA2, Inc.*, No. HHD-CV-12-6035889-S, 2015 WL 1244572, at *8 (Conn. Super. Ct. Feb. 25, 2015). The only element of Counts One and Two at issue in Catholic's motion is whether the Franzeses received "reasonably equivalent value" in exchange for the tuition they paid for their adult daughter. Catholic does not contest that Chorches has adequately alleged the other elements of these claims. Furthermore, neither Catholic nor Chorches suggests that "reasonably equivalent value" should be construed differently in the Bankruptcy Code than in the Connecticut fraudulent transfer statutes (except as to a recent amendment to the Connecticut statutes, which is discussed below). Therefore, I will analyze "reasonably equivalent value" as if it has the same meaning in both the federal and state statutes.

    A. <u>Reasonably Equivalent Value</u>

Catholic argues that the amended complaint fails to allege that the Franzeses did not receive "reasonably equivalent value" for the tuition payments they made on behalf of their adult daughter. Catholic argues that parents derive value from the college education of an adult child, because (1) "[i]t is [] commonplace among untold millions of American families, and deeply ingrained in our culture, to treat college tuition payments as a family obligation, no less so than mortgage and grocery payments," and (2) "[c]reditors know that, as surely as borrowers will use available funds to pay for the mortgage and groceries, borrowers will pay their children's college expenses to the extent they are willing and able to." (ECF No. 26 at 9–10, 12.)

Catholic's arguments are inconsistent with the text of the bankruptcy statute. Though "reasonably equivalent value" is not specifically defined, the statute defines "value" in purely economic terms, *i.e.*, "property, or satisfaction or securing of a present or antecedent debt of the debtor, but . . . not . . . an unperformed promise to furnish support to the debtor or to a relative of

5

the debtor." 11 U.S.C. § 548(d)(2)(A). Under this definition, the Franzeses did not receive any "value" in exchange for their tuition payments: they did not receive "property" of any kind, and their tuition payments did not satisfy or secure a "present or antecedent debt" that *they* (as the debtors) owed, as the Franzeses had no legal obligation to pay college tuition for Julia. *See Barbour v. Barbour*, 156 Conn. App. 383, 400–01 (2015) (observing that "in the absence of [a court support order,] statute or agreement providing for postmajority assistance . . . a parent ordinarily is under no legal obligation to support an adult child.") (quoting *Crews v. Crews*, 107 Conn. App. 279, 301 (2008), *aff'd*, 295 Conn. 153 (2010)).

Contrary to Catholic's implication, discharging a "moral obligation" or meeting a "societal expectation" is not "value" within the meaning of the statute. (*Cf.* ECF No. 28 at 2.) Congress' treatment of donations to religious organizations in the bankruptcy statute illustrates this. In response to judicial decisions holding that tithes and other donations to religious organizations were not exchanged for "value," Congress enacted the Religious Liberty and Charitable Donation Protection Act. *See, e.g., In re Bloch*, 207 B.R. 944, 948 (D. Colo. 1997) (granting summary judgment to trustee because the debtor received nothing of "economic, as opposed to religious or spiritual, value" in exchange for tithes donated to church); Pub. L. No. 105–183, 112 Stat. 517 (1998) (the "Donation Protection Act"). The Donation Protection Act created a specific exemption for donations to qualified religious organizations, provided that the donations did not exceed fifteen percent of the debtor's income or were otherwise consistent with the debtor's past practice, from the types of transfers voidable under 11 U.S.C. § 548(a)(1)(B), including those made in return for less than "reasonably equivalent value." Pub. L. No. 105–183, § 3(a)(7). Notably, however, Congress did not amend the definition of "value," leaving intact its purely economic meaning and thereby confirming that discharging moral obligations or meeting societal expectations is not

6

"value," whether received in exchange for religious tithes or, as here, tuition payments for an adult child. Instead, Congress chose to provide an express exemption from the bankruptcy trustee's avoidance power for a narrow category of transfers—certain religious tithes. Congress can likewise provide a specific statutory carve-out for tuition payments for adult children, if it deems appropriate, but it has not done so to date.

Catholic also suggests that the Franzeses received value in the form of the anticipated economic benefit they will gain in having a financially self-sufficient adult daughter due to her college education. (*Cf.* ECF No. 26 at 10–11; ECF No. 28 at 2 (citing *DeGiacomo v. Sacred Heart University (In re Palladino)*, 556 B.R. 10 (Bankr. D. Mass. 2016).) I find this rationale unpersuasive, because the prospect that an adult child will fare better financially, require less financial support, or even later repay the Franzeses is speculative. Further, the notion that paying for an adult child's college education will diminish the need for future parental support payments is itself based on a moral obligation rather than a legal one: parents are generally not required to support adult children whether or not they attend college and regardless of their financial condition. *See Barbour*, 156 Conn. App. at 400–01.

Other courts addressing this issue have similarly concluded that parents do not receive any "value" in exchange for tuition payments on behalf of an adult child. In *In re Knight,* No. 15-21646 (JJT), 2017 WL 4410455 (Bankr. D. Conn. Sept. 29, 2017), Judge Tancredi likewise reasoned that the Bankruptcy Code's definition of value in Section 548 is "limited to economic benefits that preserve the net worth of the debtor's estate for the benefit of creditors," meaning that "[m]oral or familial obligations cannot be considered in the value analysis for the obvious reason that the depletion of resources available to creditors cannot be offset by the satisfaction of moral obligations." *Id.* at *3 (internal quotation marks and citation omitted). "As cold and unsentimental

as that rule might seem," he explained, "it is easier to understand from the perspective of creditors, most of whom would probably be unwilling to volunteer to provide a financial subsidy to enhance the insolvent debtor's family relationships by allowing the debtor to put valuable property beyond their reach." *Id.* (internal quotation marks omitted) (quoting *Zeddun v. Grisworld (In re Wierzbicki)*, 830 F.3d 683, 689–90 (7th Cir. 2016)). Judge Tancredi similarly found that interpreting the Bankruptcy Code otherwise would "violate [its] plain language." *Id.*

Judge Tancredi also noted the widespread disagreement on this issue among the bankruptcy courts. *Id.* at *6–7. He specifically took issue with the discussion of the economic benefit to parents in *In re Palladino*, 556 B.R. at 16. In holding that the parents there received reasonably equivalent value for paying their adult child's college tuition, the *Palladino* court reasoned that "paying for a child to obtain an undergraduate degree will enhance the financial well-being of the child which in turn will confer an economic benefit on the parent" and that this benefit "constitutes a *quid pro quo* that is reasonable and reasonable equivalence is all that is required." *Id.* As noted, I find this notion to be speculative, as Judge Tancredi did:

> It may be reasonable for parents to believe that investment in their child's college education will enhance the financial well-being of the child. It may also be reasonable for parents to assume that their child will someday reimburse them for the cost of tuition or otherwise confer an economic benefit in return. Piling one plausible inference upon another, however, is little more than wishful thinking. Moreover, such speculation about another's ability to repay in the future and their willingness to do so, however reasonable, does not amount to a quid pro quo and certainly does not provide economic value to current creditors.

2017 WL 4410455, at *6. I agree with this reasoning and reject Catholic's arguments based on "societal expectations" and possible future benefits regarding Julia's financial self-sufficiency.

B. Single Economic Unit

Catholic also asserts that the Franzeses should be considered a "single economic unit" on the ground that Julia was under the age of 24 and, under certain federal laws, still could be

8

considered part of her parents' family. (ECF No. 26 at 13–17.) Accordingly, Catholic argues, her college tuition was a household expense like any other, and therefore not avoidable. (ECF No. 26 at 11–12, 15 n.1; ECF No. 28 at 4–5.)

Catholic first points to the "Expected Family Contribution" ("EFC") under Title IV's formula for need-based student aid. Specifically, Catholic argues that because parents are generally expected to contribute to the cost of college education for their 18 to 24-year-old children under the EFC formula, the age of majority does not cut off the parental obligation to provide financial support. (ECF No. 26 at 11–12; ECF No. 28 at 4–5.) However, the EFC is simply used to calculate the amount of need-based federal financial aid for which each student is eligible. *See* 20 U.S.C. § 1087kk ("[T]he amount of need of any student for financial assistance under this subchapter [providing for federal student assistance in the form of grants, loans, and work-study] . . . is equal to--(1) the cost of attendance of such student, minus (2) the [EFC] for such student, minus (3) estimated financial assistance not received under this subchapter [*i.e.* other scholarships, grants, loans] . . . ."); 20 U.S.C. § 1087mm ("[T]he term 'family contribution' with respect to any student means the amount which the student and the student's family may be *reasonably expected to contribute* toward the student's postsecondary education . . . .") (emphasis added); 34 C.F.R. § 668.2 (defining EFC as the "amount . . . an applicant and his or her spouse and family are expected to contribute toward the applicant's cost of attendance."). Many families either cannot or choose not to cover the EFC and, contrary to Catholic's implication, there is no legal requirement that parents contribute to college tuition at all. In addition, the EFC calculation is itself dependent on each family's ability to pay. *See* 20 U.S.C. § 1087oo (computing EFC for dependent student from student and parent's "available income" and assets). For parents like the Franzeses who are about to enter bankruptcy, the EFC would presumably anticipate little, if any, contribution to Julia's

9

education. In sum, the EFC, which Catholic describes as "the parental obligation to provide financial support for a child's education" after age 18, is not an obligation at all and is contingent on each family's financial ability. (*Cf.* ECF No. 26 at 12.) It thus ultimately adds nothing to Catholic's argument, as it essentially restates the notion that parental tuition payments on behalf of adult children are a "societal" or "moral" expectation.

Catholic also points to certain federal health insurance and tax laws that take into account adult children. (*See* ECF No. 26 at 15 n.1 (citing 42 U.S.C. § 300gg-14); ECF No. 28 at 5 (citing *Grove v. Educ. Credit Mgmt. Corp. (In re Grove)*, 323 B.R. 216 (Bankr. N.D. Ohio 2005)).) But these provisions do not expand parents' legal obligations to their adult children either. The cited provision of the Affordable Care Act imposes an obligation on *insurers*, permitting adult children under the age of 26 to remain covered by their parents' healthcare plan; but it does not require parents to provide such coverage. *See* 42 U.S.C. § 300gg-14 ("[An insurer] that provides dependent coverage of children shall continue to make such coverage available for an adult child until the child turns 26 years of age."). The cited tax code provision allows a taxpayer to claim exemptions for qualifying dependent children, including students under the age of 24 who do not provide more than half of their own support and meet other specified requirements—but the taxpayer is not required to provide that support. *See* 26 U.S.C. § 151(c) (allowing deductions for dependents); *id.* § 152(c)(3)(A)(ii) (defining qualifying dependents to include students under age 24) (cited in *In re Grove*, 323 B.R. at 229). In any event, both statutes show that Congress knew how to create exceptions to the background, state-law rule that dependency ends at the age of majority, which it has not done in the fraudulent transfer statute. These narrow carve-outs in other areas of law have no bearing on whether parents and their adult children should be treated as a "single economic

10

unit" for the purposes of whether the Franzeses received "reasonably equivalent value" under the Bankruptcy Code (or Connecticut law) for tuition payments on behalf of their adult daughter.

Catholic relies on *In re Akanmu,* 502 B.R. 124 (Bankr. E.D.N.Y. 2013), noting that the debtors in that case were held to derive benefits for paying for their child's education. But in *Akanmu*, the court held that "the education provided by the defendants to [their] *minor* children constitutes both a direct and indirect benefit to their parents, who with their children must be considered a single economic unit." *Id.* at 127–28 (emphasis added); *see also id.* at 135–36 (distinguishing cases involving parental payments of college tuition for adult children). Julia was not a minor child when the Franzeses made tuition payments. Payment for the education of minor children is distinguishable from payment for adult children's college tuition. Parents are legally responsible for ensuring that their minor children receive an education, as they are held legally responsible for their children's other needs. *See* Conn. Gen. Stat. § 10-184 (requiring parents to cause children between the ages of 5 and 18 to attend school); *In re Akanmu,* 502 B.R. at 132 ("The Debtors, by paying tuition to the Defendants and enrolling their [minor] children as students, satisfied their legal obligation to provide for their education."). But the same is not true for children 18 or older, who are legally considered adults. *See Barbour*, 156 Conn. App. at 400–01; Conn. Gen. Stat. § 1-1d (making 18 the age of majority). *Akanmu*'s "single economic unit" theory is inapplicable to adult children.

Finally, Catholic points to several other cases where debtors made payments for expenses of other family members, but those cases are easily distinguishable from the facts here. In *In re Tarin*, 454 B.R. 179 (Bankr. D.N.M. 2011), debtors paid for various services for their daughter's wedding, and the court held that the parents had directly "received value equal to what they surrendered" because they attended the wedding and enjoyed those same services. *Id.* at 184.

11

Similarly, in *In re Burry*, 309 B.R. 130 (Bankr. E.D. Pa. 2004), the court found that, even though a debtor paid half the loan payments on a boat that was actually delivered to a third party, the debtor used the boat himself and so received reasonably equivalent value for his monthly loan payments. *Id.* at 139. Both of those cases differ from this one because the Franzeses *personally* did not receive anything of value from Catholic. Catholic also cites *In re Gonzalez*, 342 B.R. 165 (Bankr. S.D.N.Y. 2006), in which the court held that a debtor, who had long held himself out to be a child's father even without a paternity test, received reasonably equivalent value for the mortgage payments he made on a house for his minor son and his son's mother, *id.* at 172–74, and *In re Vansteinberg*, No. 01-15474, 2003 WL 23838125, at *1 (Bankr. D. Kan. Nov. 26, 2003), in which the court held that it did "not see the distinction between those bills paid by the debtor on behalf of his wife [for horse riding expenses] and the myriad other household expenses that are routinely paid by a Debtor for the benefit of a non-debtor spouse when the Debtor is the sole wage earner in the family." *Id.* at *5. These cases are distinguishable as well. Both involved expenses paid on behalf of the debtors' spouses or minor children whom the debtor had obligations to support, not their adult children. Both debtors also received economic value in exchange: in *Gonzalez*, the ability to use the house, 342 B.R. at 172; and in *Vansteinberg*, the child care the debtor's wife otherwise would not have provided if she had needed to work to pay horse-related expenses. 2003 WL 23838125, at *2 (observing that the cost of horse care was less than child care for their minor children). Because the Franzeses received no direct economic value for tuition payments they made on behalf of their adult child, none of these cases support Catholic's "single economic unit" theory.

Therefore, I do not find Catholic's "single economic unit" theory persuasive as applied to tuition payments for adult children.

C. The UFTA Amendment is Not Retroactive

After this suit was filed, the Connecticut General Assembly amended § 52–552i of the Connecticut Uniform Fraudulent Transfer Act ("UFTA"), which is entitled "Defenses, liability and protection of transferee," to add a provision shielding undergraduate tuition payments from recovery as constructive fraudulent transfers:

> A transfer or obligation is not voidable under subdivision (2) of subsection (a) of section 52–552e or section 52–552f against an institution of higher education, as defined in 20 U.S.C 1001, if the transfer was made or obligation incurred by a parent or guardian on behalf of a minor or adult child in furtherance of the child's undergraduate education.

2017 Conn. Acts 17–50 (Reg. Sess.) (codified at Conn. Gen. Stat. § 52–552i) (the "2017 Amendment"). Although not in effect when the Franzeses filed their bankruptcy petition or when Catholic filed this action, Catholic argues that the 2017 Amendment applies retroactively to the Franzeses' tuition payments because it "clarifies rather than changes prior law." (ECF No. 26 at 7.)

"In determining the intended effect of a later enactment on earlier legislation, two questions must be asked. 'First, was the act intended to clarify existing law or to change it? Second, if the act was intended to make a change, was the change intended to operate retroactively?'" *State v. Magnano*, 204 Conn. 259, 277 (1987) (quoting *Circle Lanes of Fairfield, Inc. v. Fay*, 195 Conn. 534, 540 (1985)). For the first question, Connecticut employs a presumption that "in enacting a statute, the legislature intended a change in the existing law," however, "[t]his presumption . . . may be rebutted by contrary evidence of legislative intent." *Town of Middlebury v. Dep't of Envtl. Prot.*, 283 Conn. 156, 172–73 (2007) (quoting *Bhinder v. Sun Co.*, 263 Conn. 358, 369 (2003)). "An amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act," and "necessarily has retroactive effect."

13

*Id.* at 173. Connecticut courts look to several factors to determine whether the legislature intended to clarify existing legislation, including: "(1) the amendatory language; (2) the declaration of intent, if any, contained in the public act; (3) the legislative history; and (4) the circumstances surrounding the enactment of the amendment, such as, whether it was 'enacted in direct response to a judicial decision that the legislature deemed incorrect'[] or 'passed to resolve a controversy engendered by statutory ambiguity.'" *Id.* (citations omitted) (quoting *Oxford Tire Supply, Inc. v. Comm'r of Revenue Servs.*, 253 Conn. 683, 693 (2000), and *Toise v. Rowe*, 243 Conn. 623, 629 (1998))). In cases where courts found that a statutory amendment was intended to be clarifying, the pertinent legislative history provided "uncontroverted support . . . for the conclusion that the legislature considered the amendatory language to be a declaration of the legislature's *original* intent rather than a change in the existing statute." *Id.* (emphasis in original) (quoting *In re Michael S.*, 258 Conn. 621, 629 (2001)).

The language of the amendment makes plain that the legislature intended to provide a new substantive defense, not to clarify existing fraudulent transfer law. The 2017 Amendment provides that a "transfer or obligation is not voidable under subdivision (2) of subsection (a) of section 52–552e or section 52–552f against an institution of higher education" if the transfer was made by a parent for an adult child's undergraduate education, and adds this as a new subsection to the section entitled "Defenses, liability and protection of transferee." Conn. Gen. Stat. § 52–552i. The amendment does not purport to clarify the definition of "value" or "reasonably equivalent value," and it does not amend either section 52–552e or section 52–552f, which sets forth the fraudulent transfer causes of actions that rely on those terms. Rather, the amendment adds a new legal "[d]efense[]" for actions "against an institution of higher education" by providing that transfers by parents are not voidable. This is a substantive change to the law, not a clarification.

In addition,[2] the legislative history is ambiguous and thus does not provide "uncontroverted support" that the legislature intended the 2017 Amendment as a clarification. Catholic relies heavily on a statement of Senator Doyle that the amendment "clarifies basically that when primarily parents are paying for their children's college education that if bankruptcy is later filed by the parents and the bankruptcy court doesn't have the authority to reach back and take the tuition payments to the college and universities. . . . [I]t's a technical piece of legislation but it makes sense and it basically preserves tuition paid by parents or others to students in college." (ECF No. 26 at 7–8, 27–28 (60 S. Proc., Pt. 3, 2017 Sess., pp. 801–02 (Conn. 2017) (remarks of Senator Paul R. Doyle)).) Although Senator Doyle uses the verb "clarify," his statement is equivocal as to whether the act clarifies the existing state of the law. *Contrast Conn. Nat'l Bank v. Giacomi*, 242 Conn. 17, 40–41 (1997) (affording substantial weight to a legislator's unequivocal remark that the purpose of a statutory amendment was "not to change the law, but to clarify what I would consider the law [to be] . . . . It's not saying something different."). Moreover, other legislators contradict Senator Doyle on this very point. *See Town of Middlebury*, 283 Conn. at 177 ("[W]e . . . only [ascribe substantial weight to a legislator's description of the clarifying purpose of a statute] if the description is direct and unequivocal and there is no indication of a contrary legislative intent."). Immediately after Senator Doyle, Senator Kissel took the floor and stated: "[I]f a state wants a particular carveout, it can put that into statute and that's what this would do . . . . [A]s a public policy, we have decided with this legislation that an individual's desire to send their loved one, their child to college is an important public policy and we should encourage it and not allow the bankruptcy courts to go in and claw that money back." (ECF No. 27, Ex. B at 2–3

---

[2] Under the second factor, no legislative declarations of intent appear in the act. *See* 2017 Conn. Acts 17–50 (Reg. Sess.).

15

(60 S. Proc., Pt. 3, 2017 Sess. (Conn. 2017) (remarks of Senator John A. Kissel).) Senator Kissel describes the amendment as a policy carveout for college tuition payments, rather than as a clarification of a previously ambiguous statute. The legislative history is ambiguous at best, and thus does not support Catholic's argument that the 2017 Amendment was a clarification of the UFTA.

Catholic also cites a written statement of Connecticut Attorney General, George Jepsen, in support of the bill to buttress its argument that the 2017 Amendment was intended as a clarification. (ECF No. 26 at 8.) Attorney General Jepsen wrote that "[t]his bill would revise Connecticut's fraudulent transfer law to make clear that payments made by a parent or guardian to a college or university in furtherance of an adult child's college education are not voidable." (ECF No. 26 at 29 (*An Act Revising the Uniform Fraudulent Transfer Act: Hearing on S.B. 1021 Before the Jud. Comm.*, 2017 Reg. Sess. (Conn. 2017) (statement of Attorney General George Jepsen).) He further stated, "I believe that, as a matter of policy, the state should exempt from our state fraudulent transfer laws payments made and obligations incurred by a parent or guardian to a college or university in furtherance of a child's undergraduate education." (*Id.* at 30.) Attorney General Jepsen's statement refers to the 2017 Amendment as a "revis[ion]" of the law and an exemption "as a matter of policy," which also do not unequivocally demonstrate that the legislature intended to clarify existing law.

Finally, although the circumstances surrounding the enactment of the amendment are relevant, such as whether it was passed to resolve a controversy engendered by statutory ambiguity, Catholic provides no support for its claim that the 2017 Amendment was passed to address ambiguity in the UFTA, simply noting that the UFTA did "not address this particular fact pattern." (ECF No. 26 at 7.) But simply because the UFTA did not envision these precise facts

16

does not mean that the 2017 Amendment was aimed at clarifying an ambiguity in the statute's application, as opposed to restricting its reach. Even if Catholic were correct, however, this factor is outweighed by the text's strong indication that the 2017 Amendment was a substantive change and not a clarification. *See Estate of Brooks v. Comm'r of Revenue Servs.*, 325 Conn. 705, 721 (2017), *cert. denied*, 138 S. Ct. 1181 (2018) ("Not each factor is given equal weight.").

I conclude that the 2017 Amendment was intended to operate as a substantive change in, rather than a clarification to, Connecticut's fraudulent transfer law based on a new legislative policy judgment. Even so, I must briefly address the second question—whether that "change [was] intended to operate retroactively." *Magnano*, 204 Conn. at 277. Like its federal analog, Connecticut law presumes that laws that affect substantive rights[3] apply prospectively only unless the "legislature clearly and unequivocally expresses its intent that the legislation shall apply retrospectively." *Andersen Consulting, LLP v. Gavin*, 255 Conn. 498, 517 (2001). Notably, Catholic has not argued that the 2017 Amendment would overcome this presumption if the 2017 Amendment were not a clarification of the UFTA. (ECF No. 26 at 6–8.) But in any event, the legislature did not express any intent that the 2017 Amendment would apply retrospectively—in fact, the statute was explicitly made "[e]ffective October 1, 2017," and not before. 2017 Conn. Acts No. 17–50 (Reg. Sess.). I thus find that the 2017 Amendment applies only prospectively. Because the 2017 Amendment did not clarify the UFTA and is not otherwise retroactive, I reject

---

[3] The 2017 Amendment is clearly a substantive law, as opposed to a procedural law ordinarily subject to an inverse presumption. "[A] substantive law creates, defines and regulates rights while a procedural law prescribes the methods of enforcing such rights or obtaining redress." *Town of Middlebury*, 283 Conn. at 183–84 (citation and quotation marks omitted). As discussed above, the 2017 Amendment creates new rights because it provides a defense to fraudulent transfer suits against institutions of higher education to recover tuition paid by parents. *See Weber v. U.S. Sterling Sec., Inc.*, 282 Conn. 722, 739 (2007) (holding that statute which "abridge[d] the rights of individuals" to bring certain class action claims was substantive).

17

Catholic's argument that the 2017 Amendment shields the Franzeses' transfers from avoidance under Connecticut law.

## IV. Conclusion

Because Chorches has alleged plausible claims that the Franzeses did not receive reasonably equivalent value for their college tuition payments on behalf of their adult daughter and because the UFTA amendment does not apply retroactively, I DENY the defendant's motion to dismiss. The parties shall confer and file their Rule 26(f) report **within 21 days** of the date of this order.

IT IS SO ORDERED.

  /s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
July 13, 2018